JUSTICE COATS
delivered the Opinion of the Court.
¶1 The People petitioned for review of the court of appeals’ judgment reversing Opana’s conviction for second degree murder, in the shooting death of one of his housemates. See People v. Opana, No. 10CA1987, 2014 WL 2211393 (Colo. App. May 29, 2014). The district court instructed the jury as to the use of deadly physical force in defense of one’s person. In. consideration .of the statutory definition of the term “deadly physical force,” which limits the applicability of the term to “force, the intended, natural, and probable consequence of which is to produce death,” the court of appeals determined that there was adequate evidence produced at trial for the jury to have found that Opana used physical force not rising to the level of “deadly” physical force, and it concluded that in this ease the failure of the trial court to instruct the jury, sua sponte, on the use of physical force generally amounted to plain error.
¶2 Because the court of appeals misconstrued the definition of “deadly physical force,” and when that statutory term is properly construed, the evidence at trial did not support an instruction on self-defense predicated on the use of other-than-“deadly” physical force, the judgment of the court of appeals is reversed, and the case is remanded for consideration of the defendant’s remaining assignments of error.
I.
. ¶3 Kalani Opana was charged with first degree murder in the shooting death of one of his housemates.[1] A jury acquitted him of first degree murder but convicted him of the lesser included offense of second degree murder, and he was sentenced to a term of twenty-four years in the custody of the department of corrections.
¶4 The defendant testified on his own behalf at trial, and by his own account he shot the victim in the chest; at close range, with a .40 caliber semiautomatic handgun. There were varying witness accounts of a night of drinking, fighting, and abusive, racial epithets directed at the defendant by the victim, after which, according to the defendant’s testimony, he returned from a neighbor’s house in the early morning hours with the intention of notifying the victim that he was going to collect his things and move out. The defendant testified that when the victim attempted to stand and repeated the racial epithet he had uttered prior to an earlier assault, the defendant drew his gun; as a show of force to dissuade the victim from attacking him again. The defendant asserted that the gun slipped, and when he reflexively tightened his grip, it accidentally discharged, killing the victim. He expressly testified that he did not intend to pull the trigger.
*759 ¶5 The defendant requested and was given a theory-of-the-case instruction, in which the jury was informed of his explanation why a correct application of the law to the facts of the case should result in his acquittal. The defendant’s theory-of-the-case instruction indicated that he did not commit the elements of the cíame of first degree murder, or any lesser offense before the jury, because he did not intentionally discharge the handgun at all. In addition, it indicated that “he attempted to use self-defense by a show of force” and that “he quickly pulled out the handgun to defend himself through a show of force.”
¶6 The defendant also requested and received an instruction as to the affirmative defense of defense of person, or self-defense. The affirmative defense instruction given to the jury, however, instructed only as to the conditions under which the use of deadly physical force would be justified in self-defense, and not the conditions under which the use of physical force other than deadly physical force would be justified in self-defense. The record does not clearly reflect which party drafted or offered the particular affirmative defense instruction that was ultimately given, but there is no contention that the defendant objected to it as erroneous or inadequate.
¶7 On direct appeal, the court of appeals found that the defendant failed to object to the instruction that was given or to request an additional self-defense instruction, but it nevertheless reversed, finding plain' error. The court of appeals found that the applicable statutory definition limits “deadly physical force” to force which the actor uses with an intent to produce death; and because there was evidence from which the jury could have found that the defendant in this case did not actually intend to kill the victim, the court should have instructed the jury, sua sponte, on the use of other-than-“deadly” physical force in self-defense. Apart from one the court of appeals considered likely to arise on retrial, the defendant’s remaining assignments of error were left unaddressed.
¶8 The People petitioned this court for a writ of certiorari.
II.
¶9 With specifically enumerated exceptions, the Colorado Criminal Code provides a legal justification for using physical force upon another person if that physical force is used to defend the person using it from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he uses only a degree of force he reasonably believes to be necessary for that purpose.' § 18-1-704(1), C.R.S. (2016). Among the aforementioned exceptions are further restrictions on the use of deadly physical force. § 18-l-704(2)(a). In addition to reasonably believing that a lesser degree of force would be inadequate, a person is justified in using deadly physical force upon another person only under additional specified conditions, including, as pertinent here, that he also has reasonable grounds to believe, and does in fact believe, that he is in imminent danger of being killed or receiving great bodily injury. Id. The use of physical force by someone upon another person is therefore legally authorized and excused from constituting what would otherwise be a crime only if it meets the statutory requisites for using force of the degree and nature actually used. See §§ 18-l-704(l)-(2).
¶10 With regard to the statutory defense of person, the term “deadly physical force” is used as a term of art. It is statutorily defined to mean “force, the intended, natural, and probable consequence of which is to produce death, and which does, in fact; produce death.” § 18-l-901(3)(d), C.R.S. (2016). In summarily concluding that “[wjhere there is a factual dispute about whether a defendant intended to cause death by his or her use of force, and in fact caused death, both ordinary physical force and deadly physical force instructions must be given,” Opana, slip op. at 5, the intermediate appellate court offered no reasoning of its own but relied entirely on the authority of the prior holding of another division in People v. Vasquez, 148 P.3d 326 (Colo. App. 2006). The division in Vasquez had largely reasoned that because the adjectives “intended,” “natural,” and “probable,” modifying—through a prepositional phrase— the noun “force” in the definition of “deadly physical force,” were conjoined rather than *760 disjoined, it would be necessary to understand the term “intended” as adding “an intent element” to the meaning of “deadly physical force” in order to avoid effectively reading the term out of the definition altogether. 148 P.3d at 329. The Vasquez court did not, however, entertain any question concerning the meaning of the term “intended” as used by the legislature in this context or any question that the unstated subject intended by the legislature’s passive construction could be someone other than the defendant.
¶11 A statute has meaning according to the legislative intent expressed in the language of the statute itself. People v. Jones, 2015 CO 20, ¶ 10, 346 P.3d 44, 48. If a statute is clear and unambiguous, and is not in conflict with another statute, it must simply be applied as written. Holcomb v. Jan-Pro Cleaning Sys. of S. Colo., 172 P.3d 888, 890 (Colo. 2007). However, to the extent that the language of a statute is susceptible of more than one reasonable inteipretation, and is therefore considered ambiguous, a substantial body of interpretive aids, either provided by the legislature to explain its own drafting conventions and preferences for resolving conflicts, see § 2-4-203, C.R.S. (2016), or developed by the courts over centuries, see generally Norman J. Singer & Shambie Singer, Sutherland Statutes & Statutory Construction (7th ed. 2007), is available to assist in determining which of these reasonable understandings embodies the legislative intent. Jones, ¶ 10, 346 P.3d at 48. Whether consideration of the meaning of the terms involved, the syntax of the sentence in which they appear, and the context or manner in which that sentence is related to surrounding provisions should more appropriately be characterized as reliance on internal aids of construction in resolving ambiguity, or simply considerations leading to the conclusion that there is no ambiguity in the first place, is of little consequence here.
¶12 With regard to the meaning of the term “intended,” the Vasquez court’s characterization of the definition of “deadly physical force” as including “an intent element as a necessary ingredient” suggests its understanding that “intended” is used in the definition as a term of art, referring to the culpable mental state of “intentionally” or “with intent.” See 148 P.3d at 329-30; see also § 18-1-501(5), C.R.S. (2016). While the statutory culpable mental state can now have only a subjective meaning[2]—that the actor has a conscious objective to cause a specific result proscribed by statute—it is also specifically limited in applicability to the culpable mental state required for the commission of an offense. § 18-1-501(5); see, e.g., People v. Wheeler, 772 P.2d 101, 103 (Colo. 1989) (explaining that where “intent” is used in the Criminal Code other than as an element of an offense, statutory definitions of intent as mens rea do not apply); People v. R.V., 635 P.2d 892 (Colo. 1981) (same). When a term is not statutorily defined, it must be given its ordinary meaning. Marquez v. People, 2013 CO 58, ¶ 8, 311 P.3d 265, 268. Because, however, words frequently have more than one ordinary meaning, or at least more than one shading or nuance of meaning, and because even a dictionary definition broad enough to encompass a particular sense of a word does not establish that the term is ordinarily understood in that sense, Taniguchi v. Kan Pac. Saipan, Ltd., 566 U.S. 560, 132 S.Ct. 1997, 2003, 182 L.Ed.2d 903 (2012), the precise meaning actually intended by an undefined term often must be determined by reference to other considerations, like the context in which it is used, Marquez, ¶ 8, 311 P.3d at 268; see also Jones, ¶ 10, 346 P.3d at 48.
¶13 When the term “intended” is used in the passive voice or as a unit modifier, without reference to a particular subject by description or personal pronoun (e.g., “his”) or prepositional phrase (e.g., “by him”), as it is here, it is just as naturally understood to convey an objective reference, as in “normally intended” or “reasonably intended.” In determining the legislatively intended subject of the term “intended,” as that term is *761 used in the statutory definition of “deadly weapon,” we have previously concluded that it must refer to the intent of the user of the weapon. Montez v. People, 2012 CO 6, ¶ 19, 269 P.3d 1228, 1232. We did so there, however, in express reliance on the syntax of the sentence in which the term appeared. Id. Where the weapon in question was modified by the phrase, “in the manner used or intended to be used,” we reasoned that “in the manner used” on its face refers to the manner of use by the user, and in the absence of an express indication to the contrary, it would be unrealistic to conclude that the legislature intended that alternative phrase in the same sentence, “or intended to be used,” could refer to a different subject, as for instance the designer or the manufacturer. Id.
¶14 In addition to syntax, a long-accepted convention of statutory interpretation dictates that a term with more than one meaning, or nuance of meaning, appearing in a series should be understood, in the absence of a contrary intention expressed by the enacting body, to have a meaning commensurate with or in the general nature of the things with which it has been grouped. See, e.g., State v. Hartsough, 790 P.2d 836, 838 (Colo. 1990) (finding that the reference to “public hospitals” in the Colorado Governmental Immunity Act does not include veterinary hospitals largely for the reason that “[i]n that section public hospitals are grouped together with correctional facilities and jails, strongly suggesting that the section was intended to apply to public facilities designed to hold people”). See generally Sutherland Statutes & Statutory Construction, supra, § 47:16 (discussing the cannon of noscitur a sociis). The terms “natural” and “probable” with which “intended” is grouped in describing a consequence of the particular use of force in question clearly do not refer to the subjective expectation or intent of the user of that force, but rather convey the notion of an objective likelihood that, in the absence of some intervening circumstance, a result will occur.
¶15 Nor does interpreting the subject of “intended” to be a normal, or typical, person, rather than the specific user of the force in question, have the effect of depriving the term of independent meaning or reading it out of the statute altogether, as the Vasquez court feared. Apart from the fact that items appearing in a series often purposely overlap, as a means of ensuring complete coverage of the concept in question, from related but slightly different points of view or by different audiences, by limiting the kind of force in question to force that would normally or typically be intended to produce death, the term “intended” still adds an important, and distinct, dimension to the definition of “deadly physical force.” The addition of a limitation to force that a normal or typical person would use only if he intended to produce death ensures that even force the probable consequence of which would be to produce death, in the absence of some intervening event, would be excluded from the definition of “deadly physical force” if that consequence, despite being objectively probable, would nevertheless be counterintuitive.
¶16 Finally, as the extensive survey of other jurisdictions by the Vasquez court demonstrates, the Colorado Criminal Code is unusual, if not unique, in narrowly limiting the definition of “deadly physical force” to force that actually produces death. See 148 P.3d at 328-29 (surveying twenty-one jurisdictions, none of which require that the use of force actually cause death in order for the force used to be classified as deadly force). Similarly, a number of the jurisdictions cited in Vasquez as including in their definitions of deadly physical force some requirement of subjective intent or awareness on the part of the user actually require subjective intent or awareness only as an alternative to what the user “reasonably should have” known or what the likely consequence would be, rendering them effectively objective standards. See, e.g., Minn. Stat. § 609.066(1) (2016) (“ ‘[Djeadly force’ means force which the actor uses with the purpose of causing, or which the actor should reasonably know creates a substantial risk of causing, death or great bodily harm.” (emphasis added)); Vt. Stat. Ann. tit. 13, § 3261(7) (2016) (“ ‘Deadly force’ means physical force which a person uses with the intent of causing, or which the person knows or should have known would create a substantial risk of causing, death or *762 serious bodily injury.” (emphasis added)); Commonwealth v. Noble, 429 Mass. 44, 707 N.E.2d 819, 821 (1999) (“[Djeadly force” is “force intended or likely to cause death or serious bodily harm.” (emphasis added)); Earl v. State, 111 Nev. 1304, 904 P.2d 1029, 1031 n.2 (1995) (defining deadly force as force likely or intended to cause death or great bodily harm). Even the Model Penal Code approach, which the Vasquez court singles out as requiring a purely subjective state of mind, would not require that the user of the force intend to produce death, but merely that the user be aware of a substantial risk that the force actually used would do so. Model Penal Code § 3.11 (Am. Law Inst. 1985). Construing the term “intended” in its objective implication, as referring to the consequence that would normally or typically be intended, the definition of “deadly physical force” in this jurisdiction nevertheless remains among the most restrictive in the countiy. Defined objectively, as it is, the assessment whether or not physical force arguably used in self-defense constituted “deadly physical force” ceases to be a matter for the jury only where the credible evidence permits no other finding than that the physical force used by the defendant would normally be expected to, and in fact did, produce death.
¶17 While the threshold for entitlement to an instruction on an affirmative defense is low, it is not negligible. See People v. Speer, 255 P.3d 1115, 1119-20 (Colo. 2011). In this case there was no evidence from which the jury could have found that the defendant’s use of physical force upon the victim was anything other than deadly physical force. By the defendant’s own testimony and theory'of the case, he shot the victim in the chest, at close range, with a large caliber firearm. The physical force actually inflicted by the defendant upon the victim could not reasonably be characterized as anything other than force, the intended, natural, and probable consequence of which was to produce death, and there was no dispute that the victim died as the result of being shot in the chest by the defendant. Whether or not the defendant was entitled to a self-defense instruction at all, when the definition of “deadly physical force” is properly construed, he was clearly not entitled to a self-defense instruction premised on the use of any physical force other than deadly physical force.
III.
¶18 Because the court of appeals misconstrued the definition of “deadly physical force,” and when that statutory term is properly construed, the evidence at trial did not support an instruction on self-defense predicated on the use of other-than-“deadly” physical force, the judgment of the court of appeals is reversed, and the case is remanded for consideration of the defendant’s remaining assignments of error.
JUSTICE GABRIEL dissents, and JUSTICE HOOD joins in the dissent.
JUSTICE GABRIEL dissents, and JUSTICE HOOD joins in the dissent.

. The defendant was initially charged also with two counts of committing a crime of violence, which were dismissed before trial.

. Prior to the 1975 amendments to the statutory culpable mental states in this jurisdiction, "intentionally” included an arguably objective alternative, encompassing actions that merely gave rise to a substantial certainty that any prohibited result would be produced. See People v. Childress, 2015 CO 65M, ¶ 24, 363 P.3d 155, 162, as modified on denial of reh'g (Jan. 11, 2016).